UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 22-22491-CV-SCOLA/GOODMAN

CLAUDIA E. FARRAT,

      Plaintiff,

v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

      Defendant.

_____/

<u>REPORT AND RECOMMENDATIONS</u>
<u>ON CROSS-SUMMARY JUDGMENT MOTIONS</u>

This case challenges a denial of social security benefits. Plaintiff Claudia Farrat

("Farrat") and Defendant Kilolo Kijakazi, Acting Commissioner of the Social Security

Administration ("Commissioner"), filed cross-motions for summary judgment. [ECF

Nos. 15; 20]. The Commissioner's summary judgment motion also served as her

opposition response to Farrat's motion. [ECF No. 21]. Farrat filed a response to the

Commissioner's motion, which was also her reply. [ECF No. 22]. The Commissioner did

not file an optional reply.

According to the Clerk's directive in these types of administrative appeals, all

dispositive matters have been referred to the Undersigned for a Report and

Recommendations. [ECF No. 2].

As explained below, the Undersigned **respectfully recommends** that the District Court **grant** Farrat's summary judgment motion, **deny** the Commissioner's summary judgment motion, and remand the case back to the Commissioner.

## I.      Procedural Background

On July 10, 2019, Farrat applied for disability insurance benefits and supplemental security income, alleging an onset date of May 12, 2019. (R. 15; 274–78).[1] Farrat alleges disability due to depression, anxiety, degenerative disc disease of the cervical spine, fibromyalgia, lumbar spine neuropathy, "TMJ," Sjogren's syndrome, sleep apnea, and scoliosis. (R. 305). The Commissioner denied the application initially and on reconsideration. (R. 123–29; 133–64). After a hearing on August 19, 2021 (R. 36–63), Administrative Law Judge Rebecca Wolfe (the "ALJ") concluded that Farrat was not disabled. (R. 15–24). The Appeals Council denied review of the ALJ's decision. (R. 1–6). The Commissioner's final decision is now subject to review.

## II.     Factual Background

Farrat was 47 years old on the alleged onset date of May 12, 2019. (R. 27; 325). She has two years of college experience (but no associate's degree) and completed a vocational course in cosmetology. (R. 46–47; 306). She previously worked as a library

---

[1]      Citations to ("R. __") refer to pages of the administrative record transcript. [ECF No. 13].

technical assistant, hairstylist, and manager of a beauty salon/barber shop. (R. 56; 306–07; 313–15; 328–31).

At the administrative hearing before the ALJ, Farrat testified that she lived with her husband and 19-year-old daughter. (R. 46). She expressed feeling "always very sad" and would "cry very easily." (R. 49). She stated that she had "lost . . . interest in everything" and that it was "very hard for [her] to get going" because she felt drained and overwhelmed. *Id.* She testified that she had lost friends and preferred to be by herself. (R. 50).

During the day, she would do "little things" around the house like make the bed, because she felt "useless." (R. 51). She did not cook because "everyone [was] pretty much grown." *Id.* She testified that she "stay[ed] away from [alcohol]" because of her medication. *Id.*

She reported suffering from anxiety, which manifested itself in panic attacks and a racing heartbeat. (R. 50). She did not like to drive because it made her anxious. (R. 50–51). At night, she used a sleep apnea machine and stated that "it help[ed] with [her] restless leg." (R. 50).

Farrat last received treatment for her physical ailments -- spine procedures for her fibromyalgia -- in May 2019, when she still had insurance from her employer. (R. 52). She experienced improvement after that treatment "but it wasn't 100 percent" and she was unable to follow up with her doctor after she became uninsured. (R. 53). She testified that

she still had "problem[s]" with her elbows, wrists, and hands and numbness in her fingers. (R. 53–54).

At the hearing, the ALJ also heard testimony from Vocational Expert V. David Pigue (the "VE"). (R. 55–61). Farrat, who was represented by counsel at the hearing, stipulated to the VE's qualifications. (R. 55).

The VE classified Farrat's past work as: "DOT title library technical assistant, DOT code 100.367-018, [ ] light exertional, SVP of 5. DOT title hairstylist, 332.271-018, light exertional, SVP of 6. And DOT title manager, barber or beauty shop, 187.167-053, also [ ] light exertional, SVP of 7." (R. 56). Farrat did not object to these classifications. *Id.*

The ALJ posed the following hypothetical to the VE:

Assume a hypothetical individual with the claimant's age and education, with the past jobs that you've described. Further assume, for this hypothetical, the individual could perform a range of light work as defined by the DOT, but with the following limitations.

This individual could occasionally climb ramps and stairs; but never ladders, ropes, or scaffolds; occasional stoop; occasional kneel; occasional crawl; occasional crouch; frequently balance; no hazardous machinery or mechanical parts; no unprotected heights; no requirement [to] operate a motor vehicle; no concentrated exposure to fumes, odors, dust, and other pulmonary irritants; no extreme cold or extreme heat; no requirement for tasting or smelling, wetness or humidity; and no vibration.

This individual is able to understand and carry out simple, uninvolved, oral, written, and diagram instructions, but not at a production rate or pace. This individual is able to tolerate infrequent changes that are gradually introduced in a routine or work setting; can occasionally interact with coworkers and supervisors; but never with the public.

In fact, this individual performs best when the work deals primarily with

objects rather than people. This individual can maintain concentration for at least two hours at a time; would remain on task 90 percent of the workday; stated differently, would be off task not to exceed 10 percent. Would a person with these kinds of abilities be able to perform any of the claimant's past work?

(R. 56–57).

In response to the ALJ's hypothetical, the VE testified that this hypothetical claimant would not be able to perform Farrat's past work. (R. 57–58). He also testified that there were other jobs in the national economy which this hypothetical claimant could perform, including: "DOT title assembler, small products I, DOT code 706.684-022," of which there were **980,477 jobs in the national economy**, and "DOT title inspector and hand packager, DOT code 559.687-074," of which there were **623,819 jobs in the national economy**. (R. 58). The VE further stated that these jobs were representative examples and not an exhaustive list. *Id.*

The ALJ then asked the VE to opine on "reasoning levels and how they correlate or may not correlate to SVP levels." (R. 58–59). The VE explained that:

[a]s a case manager [with] over 40 plus years analyzing jobs in the competitive labor market, **[he] ha[d] never experienced a job analysis for unskilled work that would indicate a GED level of 2**, which is following detailed instructions. Thus, the definition of routine and repetitive work. The DOT does correct itself by going to a 3 level, which goes back to using common sense, which is consistent with the GED level of 1, which is the unskilled definition following one or two-step instructions.

**There may have been a time, the DOT hasn't been updated since the '80s, some unskilled jobs such as cashiering might have required some degree of additional instruction regarding numerical recording and recordkeeping. However, even cashiering has evolved to where it's all**

5

**automated and does not require any additional skills**. And that's true, even cleaning jobs are placed at an SVP of 2 and routine and repetitive.

That happens to be an occupation that has universal applications, where language barriers do not affect the work or the ability to perform the work subsequent to a short demonstration. So, the GED level of 2, of following detailed instructions, is just an unfortunate choice of word, in [his] professional opinion. But it does correct itself with the 3, going back to using common sense.

(R. 59 (emphasis added)).

The ALJ posed a second hypothetical to the VE:

[W]e have actually four mental assessments performed by different medical professionals in this case. And I'm going to try to kind of summarize all four of them into sort of one hypothetical. So, in all of them, they define the word poor as the ability to function in the area is seriously limited, but not precluded.

And the areas where they use -- professionals have indicated poor as appropriate including areas such as relating to coworkers, dealing with the public, interacting with supervisors, dealing with work stress, maintaining concentration and attention, behaving in an emotionally stable manner, relating predictably in social situations, and demonstrating reliability. If an individual -- . . . . Let me add a couple of other things in here.

Also, understanding, remembering, and carrying out complex instructions was rated at poor. Understanding, remembering, and carrying out detailed, but not complex instructions is rated at poor, and behaving in an emotionally stable manner as well as relating predictably in social situations, which I think I covered. So, singularly or combined as they are in these various statements by the doctors and practitioners, would an individual that has that level of limitation be employable in the national economy?

(R. 59–60).

The VE testified that this second hypothetical claimant would not be able to

perform competitive work:

> Well, given the defined parameter, Judge, of seriously affects the ability to function, but it does not preclude it, that's somewhat a wide range of subjectivity added to that. **I think the most important aspect would be reliability and being emotionally stable in the competitive workplace or work market**. The unskilled jobs that were provided does [sic] not require the interaction with [the] public.

> Subsequent short demonstration, ongoing supervision should not be required, thus the routine and repetitive aspect. And the unskilled work certainly does not require a complex or detailed task. **But a degree of appropriate behavior is certainly expected in the competitive labor market**.

> **And an employer would not react in a positive way if there was instability during the course of the workday**. And the reliability may not only affect pace and persistence, but certainly time and attendance. So, without specific parameters on those, **I would say, in general, they would preclude meaningful time competitive standards**.

(R. 60–61 (emphasis added)).

The VE stated that his testimony was "[c]onsistent with the DOT, . . . other than as indicated. And [was] based on [his] vocational experience, expertise, 40 plus years as a certified case manager and rehabilitation counselor analyzing jobs in the competitive labor market, documenting the demands of those jobs, and placing clients within those capacities." (R. 61).

Plaintiff's attorney did not ask the VE any hypotheticals because the ALJ had "incorporated [the RFC forms completed by the treating sources] into [her] last hypo[thetical]." *Id.* Nor did Plaintiff's attorney raise any objection to the job numbers testified to by the VE.

### III.    Applicable Legal Standards

In evaluating a claim for disability benefits, an ALJ must follow the five steps outlined in 20 C.F.R. §§ 416.920(a) and 404.1520, which the Undersigned summarizes as follows:

1.    **Step one**. Is the claimant performing substantial gainful activity? If not, then an ALJ next determines:

2.    **Step two**. Does the claimant have one or more severe impairments? If the claimant does, then an ALJ next considers:

3.    **Step three**. Does the claimant have a severe impairment that meets or equals an impairment specifically listed in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, then the claimant is disabled; if not, then an ALJ must determine the claimant's residual functional capacity ("RFC"); and then determine:

4.    **Step four**. Based on the RFC, can the claimant perform his or her past relevant work? If so, then the claimant is not disabled. If the claimant cannot perform his or her past relevant work, then an ALJ must finally determine:

5.    **Step five**. Based on the claimant's age, education, and work experience, and the RFC, can he or she perform other work? If so, then the claimant is not disabled. If not, then the claimant is disabled and entitled to benefits.

*See Phillips v. Barnhart*, 357 F.3d 1232, 1237 (11th Cir. 2004).

The claimant bears the burden of proving that she is disabled within the meaning of the Social Security Act. *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). In reviewing the decision, the Court must consider the record as a whole and determine whether the ALJ applied the correct legal standard and whether substantial evidence in the record supports the ALJ's findings of fact. *Powers v. Heckler*, 738 F.2d 1151, 1152 (11th

Cir. 1984). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Phillips*, 357 F.3d at 1240 n.8 (internal citation omitted).

The Court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal citation omitted). And "[i]f the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Id.* (internal citation omitted).

The Court is authorized to enter a judgment affirming, modifying, or reversing the decision of an ALJ, with or without remand. 42 U.S.C. § 405(g); *Crawford & Co. v. Apfel*, 235 F.3d 1298, 1302 n.13 (11th Cir. 2000).

## IV.    The ALJ's Findings

In denying Farrat's claim for benefits, the ALJ followed the sequential five-step evaluation process for social security claims. (R. 15–29). At step one, the ALJ concluded that Farrat had not engaged in substantial gainful activity since May 12, 2019, the alleged onset date. (R. 18).

At step two, the ALJ concluded that Farrat had the following severe impairments: "depression; anxiety disorder/posttraumatic stress disorder; inflammatory arthritis; degenerative disc disease/spine disorder; and obstructive sleep apnea." *Id.*

At step three, the ALJ concluded that Farrat did not have an impairment or

combination of impairments classifiable as a listed impairment in 20 C.F.R. Part 404,

Subpart P, Appendix 1. (R. 18–20). Next, the ALJ determined that Farrat has the RFC:

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)
> except that she has non-exertional limitations. Specifically, the claimant can
> occasionally climb ramps and stairs, but can never climb ladders, ropes, or
> scaffolds. The claimant can occasionally stoop, kneel, crouch, and crawl.
> She can frequently balance. **The clamant [sic] can never be exposed to the
> following environmental factors: hazardous machinery/mechanical
> parts**; operation of a motor vehicle; unprotected heights; extreme cold and
> heat; tasting/smelling; wetness/humidity; vibration; and concentrated
> fumes, odors, dust, and irritants. As for mental functions, the claimant can
> understand, remember, and carry out simple uninvolved oral, written, and
> diagrammed instructions, but not at a production rate or pace. The claimant
> is able to tolerate infrequent changes that are gradually introduced in a
> routine work setting. In addition, the claimant is able to interact
> occasionally with coworkers and supervisors, but she can never interact
> with the public. Lastly, the claimant can maintain concentration for at least
> 2 hours at a time. She would be able to be on task for 90 percent of the
> workday.

(R. 20 (emphasis added)).

At step four, the ALJ concluded that Farrat had past relevant work as a library tech

assistant, hair stylist, and barber/beauty shop manager. (R. 27).

Lastly, at step five, the ALJ found that there are jobs existing in significant numbers

in the national economy that Farrat can perform, including "[a]ssembler, small products"

and "[i]nspector, hand packager." (R. 27–28). Accordingly, the ALJ found that Farrat has

not been under a disability from May 12, 2019, through the date of the ALJ's decision

(November 2, 2021). (R. 28–29).

10

V.      **Analysis**

Farrat raises two arguments in support of reversal. [ECF No. 15]. First, she argues that due to unresolved apparent conflicts, the VE's testimony does not constitute substantial evidence. Second, she asserts that the ALJ failed to properly assess the supportability prong in addressing the opinion evidence. The Commissioner maintains that the ALJ's decision is supported by substantial evidence. [ECF No. 20]. For the reasons discussed below, the Undersigned **respectfully recommends** that the Court remand this case with instructions to the ALJ to address the supportability prong in assessing the opinions of Dr. Susan Schlolz-Rubin and Nurse Ernesto Guevara.

A.      *Alleged Apparent Conflicts with the VE's Testimony*

Farrat argues that the VE's testimony does not constitute substantial evidence upon which the ALJ could rely because there were three unresolved conflicts. [ECF No. 15, pp. 5–14]. Specifically, Farrat argues that: (1) "the VE's job incidence testimony is entirely unreliable because it **grossly exaggerates the number of available full-time jobs in the national economy** in contrast to the federal government's own estimates;" (2) "the environmental requirements of the Assembler, Small Parts I, job exceed Farrat's RFC;" and (3) the Reasoning Level requirements of the Assembler, Small Parts I, and Inspector and Hand Packager jobs exceed Farrat's RFC." *Id.* (emphasis added).[2]

An "apparent conflict" is "more than just a conflict that is made apparent by the

---

[2]      The parties use "small **parts**" and "small **products**" interchangeably in their briefs.

express testimony of the VE." *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1365 (11th Cir. 2018). "It is a conflict that is reasonably ascertainable or evident from a review of the DOT and the VE's testimony." *Id.* "At a minimum, a conflict is apparent if a reasonable comparison of the DOT with the VE's testimony suggests that there is a discrepancy, even if, after further investigation, that turns out not to be the case." *Id.* In other words, "apparent" means "seeming real or true, but not necessarily so." *Id.* at 1366 (quoting *Pearson v. Colvin*, 810 F.3d 204, 209 (4th Cir. 2015)). For the reasons discussed below, none of these "apparent conflicts" warrant a remand.

### 1.      Number of Available Jobs in the National Economy

Farrat accuses the VE of "grossly exaggerating" the number of full-time jobs in the national economy for the two representative jobs he provided. She states that:

> the VE testified that there are **980,477** *Assembler, Small Products I*, jobs in the national economy ([R]. 58). This particular job belongs to the Standard Occupational Classification ("SOC") group "51-9199, Production Workers, All Other." Yet, the Department of Labor's Occupational Employment and Wage Statistics ("OEWS") data, the only source for national jobs incidence data published by the federal government, reflects a mere total of **204,500** jobs for the **entire** SOC group, which includes **both full-time and part-time positions** and **contains a total of 1,589 DOT codes,** only one of which is *Assembler, Small Parts I* (*see* Exhibit A -- Department of Labor OEWS Number Estimate for SOC Group 51-9199, also found at https://www.bls.gov/oes/current/oes519199.htm). By the VE's calculations, then, there are at least over *775,000 Assembler, Small Parts I,* jobs as the federal government says there are in the entire SOC group of 1,589 jobs. **The VE's job incidence testimony is thus nothing short of grossly exaggerated, wildly speculative, and lacking of even a remote correlation to easily verifiable, factual information**. To put the VE's testimony in another context, even "equal distribution" method of calculating the number of jobs based on OEWS data (obtained by dividing the total number

of jobs in the SOC group, 204,500, by the number of individual DOT occupations in the SOC group, 1,589) would only yield approximately 129 jobs (combined full-time and part-time) for each one of the individual 1,589 DOT codes, which is substantially less than the **980,477** number of *Assembler, Small Parts I,* jobs the VE testified existed. The discrepancy between the **980,477** full-time *Assembler, Small Parts I,* jobs testified to by the VE, compared against the **204,500** that exist for the entire SOC group or, alternatively, the **129** full-time and part-time jobs resulting from application of the "equal distribution" method, is of such a vast disparity that the VE's testimony simply cannot constitute substantial evidence upon which the ALJ could reasonably rely.

[ECF No. 15, pp. 6–7 (some emphasis in original)].

Concerning the inspector and hand packager job, Farrat similarly notes that:

the VE testified that there are **623,819** *Inspector and Hand Packager* jobs in the national economy ([R]. 58). This particular job belongs to the [SOC] group "51-9061, Inspectors, Testers, Sorters, Samplers, and Weighers." Yet, the Department of Labor's OEWS data again reflects a mere total of **551,380** jobs for the **entire** SOC group, which includes **both full-time and part-time positions and contains a total of 782 DOT codes,** only one of which is *Inspector and Hand Package[r]* (*see* Exhibit A -- Department of Labor OEWS Number Estimate for SOC Group 51-9061, also found at https://www.bls.gov/oes/current/oes519061.htm). By the VE's calculations, then, there are at least over 72,000 more *Inspector and Hand Packager* jobs as the federal government says there are in the entire SOC group of 782 jobs. Again, **the VE's job incidence testimony is thus nothing short of grossly exaggerated, wildly speculative, and lacking of even a remote correlation to easily verifiable, factual information**. To put the VE's testimony in the "equal distribution" context, calculating the number of jobs based on OEWS data (obtained by dividing the total number of jobs in the SOC group, 551,380, by the number of individual DOT occupations in the SOC group, 782) would only yield approximately **705** jobs (combined full-time and part-time) for each one of the individual 782 DOT codes, which is substantially less than the **623,819** number of *Inspector and Hand Packager* jobs the VE testified existed. The discrepancy between the **623,819** full-time *Inspector and Hand Packager* jobs testified to by the VE, compared against the **551,380** that exist for the entire SOC group or, alternatively, the **705** full-time and part-time jobs resulting from application of the "equal distribution"

method, is of such a vast disparity that the VE's testimony simply cannot constitute substantial evidence upon which the ALJ could reasonably rely.

*Id.* at 7–8 (some emphasis in original).

But Plaintiff (who was represented by an attorney at the administrative level) did not raise these job number discrepancies or seek to introduce her own job numbers data at the administrative hearing. In fact, at the administrative hearing, Plaintiff's attorney stipulated to the VE's qualifications (R. 55) and did not raise any objections to his testimony.[3]

---

[3]     Plaintiff argues that the instant case is "substantially [the] same situation" as *Viverette v. Comm'r of Soc. Sec.*, 13 F.4th 1309 (11th Cir. 2021). [ECF No. 15, p. 11]. In *Viverette*, the Eleventh Circuit found that there was a conflict between the plaintiff's RFC and the VE's testimony that he could perform the job of document preparer. *Id.* at 1318. The VE testified that there were 104,000 document preparer positions in the national economy. The other two remaining jobs were significantly less in number: 7,000 final assembler positions and 14,000 check weigher positions nationally. *Id.* Moreover, the ALJ "apparently treated the three occupations . . . cumulatively for purposes of the 'significant numbers' determination, for she did not make any findings about how many jobs were available in the national economy for each of the occupations." *Id.* Thus, remand was appropriate not only because of the apparent conflict concerning the document preparer job but also because the VE failed to "estimate what portion of jobs within the relevant SOC code Mr. Viverette [could] perform, the 14,000 number for the check weigher position may [have been] overstated." *Id.* at 1319.

Here, the ALJ's decision specifically notes the number of jobs available for each representative occupation: 980,477 for assembler, small products and 623,819 for inspector, hand packager. (R. 28). Moreover, the Eleventh Circuit has affirmed the "significant numbers" finding where the ALJ determined that there were as little as 80,000 jobs available in the national economy. *See Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1987); *Thomas v. Comm'r of Soc. Sec.*, 497 F. App'x 916, 920 (11th Cir. 2012) (finding harmless error where, after the jobs inconsistent with the plaintiff's RFC were removed, there were still sufficient jobs existing in the economy for the remaining jobs to support a finding that the plaintiff was not disabled).

Therefore, the Court cannot consider **new evidence** which Plaintiff now seeks to introduce in the form of Occupational Employment and Wage Statistics [ECF No. 15-1]. "[The Court] review[s] only whether the ALJ's decision was supported by substantial evidence, and '[ ] **will look only to the evidence actually presented to the ALJ**.'" *Valdez v. Comm'r of Soc. Sec.*, 808 F. App'x 1005, 1009–10 (11th Cir. 2020) (quoting *Falge v. Apfel*, 150 F.3d 1320, 1323 (11th Cir. 1998) (emphasis added)).

In *Valdez*, the Eleventh Circuit refused to consider new evidence concerning job numbers because this evidence had not been presented (and no objection was raised) at the administrative level:

> At the hearing, the only evidence presented to the ALJ concerning the number of lens inserter and lens-block gauger jobs available was the vocational expert's testimony that there were approximately 78,000 of them in the national economy. **[The plaintiff] didn't present the occupational employment statistics before the ALJ or object to the vocational expert's testimony. In fact, he stipulated that the vocational expert was qualified to testify. As a result, we are foreclosed from considering the data in the occupational employment statistics on appeal**.

*Id.* at 1010 (emphasis added).

Similarly in *Wooten v. Comm'r of Soc. Sec.*, the Eleventh Circuit noted that:

> the only evidence presented to the ALJ regarding the number of "final assembler" jobs was the interrogatory response of the vocational expert, in which the vocational expert stated that 235,000 of those jobs existed nationwide. **[The Plaintiff] didn't present the County Business Patterns evidence before the ALJ, nor did she object to or question the ALJ's estimation of the number of "final assembler" jobs during the administrative proceedings. We think, therefore, that the uncontradicted testimony of the vocational expert provided the ALJ with substantial evidence in the record supporting the ALJ's decision**.

787 F. App'x 671, 675 (11th Cir. 2019) (emphasis added).

The Court should reach the same conclusion here, where Plaintiff's attorney stipulated to the VE's qualifications, raised no objections to his testimony, and did not seek to introduce competing evidence concerning job numbers. Because the VE's testimony went unchallenged at the administrative level, it provides substantial evidence to support the ALJ's decision that there were a sufficient number of assembler, small products jobs and inspector, hand packager jobs in the national economy.

Farrat does not dispute that, at the administrative level, she did *not* seek to introduce the OEWS data or object to the VE's testimony as being inconsistent with the OEWS data. She cannot point to any portion of the administrative record where she challenged the VE's job numbers testimony. Instead, she argues that the ALJ had equal access to the same information: "the ALJ had access to the publicly available OWES data from her own employer and failed to make even the slightest effort to corroborate the VE's grossly exaggerated job numbers testimony." [ECF No. 22, p. 3]. Plaintiff further states that "the ALJ had complete access to several additional resources through SSA's own Digital Library" including "OccuBrowse, Job Browser Pro, and OASYS." *Id.* at 4.

Plaintiff also claims she is not introducing *new* evidence because "the ALJ had this information at her disposal all along and failed to take any measures to ensure the reasonableness of the VE's testimony instead of blindly relying upon it." *Id.* But if that were the case, then decisions like *Valdez* -- which concerned "data published in the

16

Department of Labor's occupational employment statistics", 808 F. App'x at 1009 -- would not exist because an ALJ would *always* be imputed with all knowledge at his or her disposal. Moreover, Plaintiff's this-is-not-new-evidence argument is not supported by any legal authority and therefore is not properly raised. *See United States Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (refusing to address a "perfunctory and underdeveloped argument" with no citation to legal authority and collecting cases).

In sum, having failed to challenge the VE's job numbers testimony at the administrative level, Plaintiff cannot now introduce new evidence to the District Court. As noted above, the Court "'**will look only to the evidence actually presented to the ALJ**.'" *Valdez*, 808 F. App'x at 1009–10 (11th Cir. 2020) (quoting *Falge*, 150 F.3d at 1323 (emphasis added)). Plaintiff is therefore foreclosed from raising this job numbers discrepancy for the first time before the District Court. *See Koehler v. Kijakazi*, No. 2:22-CV-210-JES-KCD, 2023 WL 1098234, at *6 (M.D. Fla. Jan. 30, 2023) ("The ORS data cannot serve as a basis for error because plaintiff did not confront the VE with this ORS data during the hearing, or otherwise present it to the ALJ, or present it to the Appeals Council."); *Mesa v. Kijakazi*, No. 21-20424-CIV, 2022 WL 4369733, at *11 (S.D. Fla. May 11, 2022), *report and recommendation adopted*, No. 21-20424-CIV, 2022 WL 4366950 (S.D. Fla. Sept. 21, 2022) (rejecting the plaintiff's claim that the VE's testimony concerning job availability did not constitute substantial evidence based on counsel's post-administrative hearing research).

2.      **Whether the Assembler, Small Parts I Job Conflicts with the RFC**

Next, Farrat argues that the environmental requirements of the assembler, small parts I, job exceeds her RFC. She notes that her RFC includes "a host of . . . environmental limitations," including that she "can never be exposed to . . . mechanical parts." [ECF No. 15, pp. 8–9 (quoting (R. 20))]. She further notes that:

> [T]he DOT job description of *Assembler, Small Parts I*, provides, in part, the following:
>
> > Loads and unloads previously setup machines, such as arbor presses, drill presses, taps, spot-welding machines, riveting machines, milling machines, or broaches, to perform fastening, force fitting, or light metal-cutting operation on assembly line.
>
> DOT Code No. 706.687-074 [sic][4] (*see* Exhibit B – [DOT] *Assembler, Small Parts I*, and *Inspector and Hand Packager* Job Descriptions).

*Id.* at 9 (footnote added).

The Commissioner maintains that there is no apparent conflict here because "the DOT identifies the assembler small products and inspector, hand packager jobs as **involving no moving machinery**." [ECF No. 20, p. 8 (emphasis added)].

In her reply, Plaintiff repeats that "the VE's testimony that an individual with Farrat's same functional limitations could perform the *Assembler, Small Parts I*, job is

---

[4]      The DOT number for assembler, small products is 706.6**84-022**, was correctly listed in an earlier part of Plaintiff's motion [ECF No. 15, pp. 6] and her exhibit [ECF No. 15-2].

inconsistent with the information contained in the DOT." [ECF No. 22, p. 5 (italics in original)].

As noted in *Washington*,

> SSR 00-4p imposes a duty on ALJs to identify and resolve apparent conflicts between DOT data and VE testimony, and this duty is not fulfilled simply by taking the VE at his word that his testimony comports with the DOT when the record reveals an apparent conflict between the VE's testimony and the DOT.

906 F.3d at 1362. However, and as discussed below, Plaintiff has failed to show an apparent conflict.

In her hypothetical to the VE, the ALJ described the hypothetical claimant as someone who "could occasionally climb ramps and stairs; but never ladders, ropes, or scaffolds; occasional stoop; occasional kneel; occasional crawl; occasional crouch; frequently balance; **no hazardous machinery or mechanical parts** . . . ." (R. 56–57 (emphasis added)).

In *Feger v. Saul*, the plaintiff argued that there was an unresolved conflict between his RFC -- which "precluded more than occasional exposure to excessive vibration and hazards such as machinery with moving mechanical parts" -- and the DOT job descriptions of assembler, small parts I and subassembler. No. 4:19-CV-00339-DGK, 2020 WL 2544426, at *4 (W.D. Mo. May 19, 2020). The district court found this argument "without merit"

> **because neither job involves exposure to mechanical parts**. First, considering the role of a small-products assembler, the DOT states that

work is done "by hand tweezers, or tongs . . . . or using handtools or portable powered tools." DOT 706.684-022. **While the work may include loading and unloading of "previously setup machines" that have moving mechanical parts, the work itself does not involve the use of those machines**.

*Id.* (emphasis added).

In *Rhodes v. Saul*, the plaintiff's RFC included "the environmental limitation that [she] must avoid 'all exposure to hazards of heights and machinery.'" No. 4:18-CV-00986-NKL, 2019 WL 5618084, at *8 (W.D. Mo. Oct. 31, 2019). The district court determined that there was no conflict between this limitation and the DOT job description for small products assembler and electrical accessory assembler because:

the RFC [did] not prohibit [the plaintiff] from exposure to all machinery but rather limits her exposure to the "hazards of . . . machinery." [ ] "**The 'hazards' defined in the [Selected Characteristics of Occupations Defined (SCO)] . . . include: moving mechanical parts of equipment**, tools, or machinery; electrical shock; working in high, exposed places; exposure to radiation; working with explosives; and exposure to toxic, caustic chemicals." Social Security Ruling 96-9p, 1996 WL 374185. **Both small products assembler and electrical accessory assembler descriptions provide that proximity to any of these hazards, including moving mechanical parts, is "Not Present – Activity or condition does not exist."** Therefore, **even though the positions may include exposure to some machinery, they do not include exposure to the "hazards . . . of machinery,"** and are thus not in conflict with the RFC. *See Cranfill v. Colvin*, No. 1:10CV925, 2013 WL 1736597, at *8 (M.D.N.C. Apr. 9, 2013) (rejecting the argument that the positions of small products assembler and electrical accessory assembler conflicted with an RFC that prohibited "no hazardous equipment" because the job descriptions did not indicate that any of the hazards set forth in SSR 96-p were present[ ]); *Malgra v. Astrue*, No. ED CV 11–0724–SP, 2012 WL 443741, *6 (C.D. Cal. Feb. 10, 2012) (finding that "contrary to plaintiffs contention, there is no inconsistency between the DOT and plaintiff's RFC precluding him from working around 'hazardous' machinery'" where the job in question "does not require work

20

around" the hazards described in SSR 96–9p); *Norwood v. Astrue*, No. CV 09–3996–RC, 2010 WL 2509358, *6 (C.D. Cal. June 17, 2010) ("[T]here is a significant difference between machinery and 'hazardous machinery,' which refers to moving mechanical parts, of equipment, tools, or machinery [and] [s]ince neither the 'assembler' job nor the 'packer' job requires exposure to 'hazardous machinery,' the failure to include [a] limitation precluding 'concentrated exposure to hazards' in the hypothetical question to the [VE] was, at most, harmless error.") (internal citations omitted).

No. 4:18-CV-00986-NKL, 2019 WL 5618084, at *8 (W.D. Mo. Oct. 31, 2019) (emphasis added; footnote omitted).

Here, the ALJ imposed a limitation of "**no hazardous machinery or mechanical parts** . . . ." (R. 56–57 (emphasis added)). The ALJ's decision lists this limitation as "hazardous machinery/mechanical parts." (R. 20). As explained in SSR 96-9P:

> **The "hazards" defined in the SCO** are considered unusual in unskilled sedentary work. They **include: moving mechanical parts of equipment, tools, or machinery**; electrical shock; working in high, exposed places; exposure to radiation; working with explosives; and exposure to toxic, caustic chemicals. Even a need to avoid all exposure to these conditions would not, by itself, result in a significant erosion of the occupational base.

Titles II & XVI: Determining Capability to Do Other Work-Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work, SSR 96-9P (S.S.A. July 2, 1996) (emphasis added). As the Commissioner points out, "the DOT identifies the assembler small products and inspector, hand packager jobs as **involving no moving machinery**." [ECF No. 20, p. 8 (emphasis added)].

Because the assembler, small products I job does not involve moving mechanical parts, it does not involve a hazard as defined by the SCO and thus, there is no conflict

(apparent or otherwise) with Plaintiff's RFC limitation of "hazardous machinery/mechanical parts." (R. 20). In sum, because Plaintiff has failed to show an apparent conflict between the DOT job description for assembler, small products I and her RFC limitation, no apparent conflict exists and there is nothing for the ALJ to resolve.[5]

### 3.   Whether Reasoning Level 2 Jobs Exceed the RFC

Next Farrat argues that the reasoning levels for both assembler, small products I and inspector, hand packager jobs exceed her RFC because:

> the ALJ's RFC finding limiting [her] to "simple uninvolved oral, written, and diagrammed instructions" . . . is an amalgamation of three, or possibly four, separate Reasoning Levels ([R]. 20). *See* Exhibit C -- DOT, Appendix C. That is, the word "simple" appears only in the description of Reasoning Level 1 work; the word "uninvolved" appears only in the description of Reasoning Level 2 work; and the phrase "oral, written, and diagrammed" ("written, oral, diagrammatic" to quote the DOT precisely) appears only in the descriptions of Reasoning Levels 3 and 4 work. DOT, Appendix C.

***

---

[5]    The Undersigned also notes that the ALJ listed *two* representative occupations: assembler, small products and inspector, hand packager. (R. 28). Plaintiff raises an alleged apparent conflict with the environmental limitations of only *one* of those occupations: assembler, small products. There are 628,819 positions in the national economy for the other, remaining occupation of inspector, hand packager. *See Wooten*, 787 F. App'x at 674 (finding that even if the plaintiff was correct in arguing that there was a conflict between her RFC and the reasoning level required for two representative occupations, the error would be harmless because the plaintiff had not alleged that the third representative occupation was inconsistent with her RFC). But since the Commissioner did not raise harmless error, the Undersigned will not make that argument for her. *See Richtner v. Berryhill*, No. 1:18CV25-MW/CAS, 2018 WL 4291800, at *14 (N.D. Fla. July 23, 2018), *report and recommendation adopted*, No. 1:18CV25-MW/CAS, 2018 WL 4291732 (N.D. Fla. Sept. 7, 2018) ("No party addressed the harmless error standard and the undersigned declines to address it *sua sponte*." (italics added)).

> [G]iven the word "simple" appears only in the Reasoning Level 1
> description, and that the jobs of Assembler, Small Parts I, and Inspector and
> Hand Packager require a Reasoning Level 2, the ALJ's reliance on the VE's
> testimony that an individual with Farrat's same limitations is error [sic]
> because the requirements of these jobs plainly exceed Farrat's RFC to some
> form of Reasoning Level 1 work.

[ECF No. 15, pp. 9–10].

The Commissioner states that "Plaintiff has not sufficiently demonstrated that her

mental impairments limited her to reasoning level 1 work, nor did the ALJ find that to be

true." [ECF No. 20, p. 8 (citing R. 20)]. She notes that:

> The ALJ found [Plaintiff] capable of understanding, remembering, and
> carrying out simple uninvolved oral, written, and diagrammed instructions
> ([R]. 20). Furthermore, the ALJ specifically asked the VE about reasoning
> levels and the VE testified that the unskilled job market would indicate a
> general education degree (GED) level of 1 and 2 and allows simple,
> detailed, routine, and repetitive work ([R]. 59). He also explained that
> automation in some jobs prevents the need to acquire additional skills ([R].
> 59). Consistent with *Washington*'s and SSR 00-4p's requirement to resolve
> conflicts between the DOT and the VE's testimony, the ALJ properly
> resolved any conflict between the VE's testimony and the DOT concerning
> the reasoning level of the identified jobs before relying on the VE's
> testimony ([R]. 28).

*Id.* at 8–9.

In her reply, Farrat states that:

> the Commissioner fails to reconcile the fact that the ALJ's RFC finding
> limiting Farrat to "simple uninvolved oral, written, and diagrammed
> instructions" . . . is an amalgamation of three, or possibly four, separate
> Reasoning Levels ([R]. 20). *See* Exhibit C -- DOT, Appendix C. That is, the
> word "simple" appears only in the description of Reasoning Level 1 work;
> the word "uninvolved" appears only in the description of Reasoning Level
> 2 work; and the phrase "oral, written, and diagrammed" ("written, oral,

diagrammatic" to quote the DOT precisely) appears only in the descriptions of Reasoning Levels 3 and 4 work. DOT, Appendix C.

[ECF No. 22, p. 5–6].

The Undersigned finds that Plaintiff has failed to show a conflict between her RFC, limiting her to "simple uninvolved oral, written, and diagrammed instructions" (R. 20), and the representative Level 2 occupations of assembler, small products I and inspector, hand packager. (R. 28). The Eleventh Circuit has determined that there is no apparent conflict between a limitation of "simple instructions" and reasoning level 2. *See Buckwalter v. Acting Comm'r of Soc. Sec.*, 5 F.4th 1315, 1323 (11th Cir. 2021) ("Although there is potentially tension between [the plaintiff]'s limitations to simple instructions and reasoning level two, **that tension does not rise to the level of an "apparent" conflict as we have defined it**." (citing *Washington*, 906 F.3d at 1366 (emphasis added)).

Moreover, although the RFC includes "oral, written . . . instructions," Plaintiff ignores the qualifier that these instructions be "simple" and "uninvolved." A job with level 2 reasoning requires that a worker "[a]pply commonsense understanding to carry out **detailed but uninvolved written or oral instructions**" and [d]eal with problems involving a few concrete variables in or from standardized situations." DOT, App. C, 1991 WL 688702 (emphasis added). Thus, the ALJ's limitation of "simple uninvolved oral, written, . . . instructions" is consistent with a level 2 job. *See Buckwalter*, 5 F.4th at 1323 ("There is not an apparent conflict here between [the plaintiff]'s RFC, which limits her to

the ability to 'understand, carry-out, and remember simple instructions,' and the identified positions with a reasoning level of two.").

Lastly, Plaintiff has not shown any conflict with the ALJ's inclusion of diagrammed instructions because the two representative occupations listed in the decision (assembler, small products and inspector, hand packager) are unskilled, level 2 jobs. (R. 28). As such, they would *not* involve diagrammed instructions of *any* kind (whether simple, involved, or otherwise). *See Luchsinger v. Kijakazi*, No. 22-55599, 2023 WL 3735568, at *1 (9th Cir. May 31, 2023) ("Because reasoning Level 3 omits any adjective modifying the term "instructions," it clearly lacks Level 2's express limitation to "detailed but uninvolved" instructions. **Level 3 also requires an ability to follow 'diagrammatic' instructions, and not merely 'written or oral instructions**.'" (emphasis added)); *Nicoleta S. v. Saul*, No. CV 20-5365-PLA, 2021 WL 663122, at *9 (C.D. Cal. Feb. 19, 2021) ("**Reasoning Level 3 expands the Reasoning Level 2 requirements** of being able to follow 'uninvolved' oral or written instructions, **to include being able to follow instructions in diagrammatic form** as well as oral and written forms[.]" (quoting DOT, App. C (emphasis added)). There are no level 3 jobs in the ALJ's decision. Thus, Plaintiff would not be exposed to diagrammed instructions in the two level 2 jobs listed in the decision.

In sum, Plaintiff has failed to show a conflict between the VE's testimony and the DOT.

**B.**      *Failure to Assess the Supportability Prong of the Opinion Evidence*

Farrat also argues that this case should be remanded because the ALJ failed to address the **supportability** prong in assessing the opinion evidence. [ECF No. 15, pp. 14–23]. Plaintiff does not challenge the ALJ's application of the consistency prong. "[A]ny argument not raised is deemed waived for purposes of this appeal." *Ramos v. Saul*, No. 18-24519-CIV, 2020 WL 5096879, at *6 (S.D. Fla. Aug. 28, 2020) (citing *Robinson v. Astrue*, 235 F. App'x 725 (11th Cir. 2007); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318-19 (11th Cir. 2012)). Therefore, the Undersigned's discussion of the opinion evidence is limited to the supportability prong.[6]

---

[6]      Plaintiff *does* characterize the ALJ's discussion of the consistency prong as insufficient. [ECF No. 15, p. 18 ("**While the ALJ arguably discussed, albeit insufficiently, the 'consistency' of the opinions of Dr. Scholz-Rubin, Dr. Iglesias, and FNP Guevara against the findings in their own and others' treatment records,** the ALJ made no effort to discuss the "supportability" of these opinions[.]" (emphasis added)).]. However, she does not elaborate further on this alleged insufficiency or raise any substantive arguments concerning the *consistency* prong.

Thus, to the extent Plaintiff seeks to challenge the ALJ's application of the *consistency* prong (and it is not clear that she does), that argument is waived. *See Jacobus v. Comm'r of Soc. Sec.*, 664 F. App'x 774, 777 (11th Cir. 2016) (treating claimant's perfunctory argument that the ALJ erred by giving great weight to a doctor's testimony as "arguably abandoned"); *Gaskey v. Colvin*, No. 4:12-CV-3833-AKK, 2014 WL 4809410, at *7 (N.D. Ala. Sept. 26, 2014) (refusing to consider claimant's argument when claimant failed to explain how the evidence undermined the ALJ's decision); *Severance-Lopez v. Comm'r of Soc. Sec.*, No. 619CV282ORL22DCI, 2019 WL 9047179, at *3 (M.D. Fla. Dec. 2, 2019), *report and recommendation adopted*, No. 619CV282ORL22DCI, 2020 WL 1181949 (M.D. Fla. Mar. 12, 2020) (treating argument that the RFC was not supported by substantial evidence as waived because the claimant did not explain how the RFC lacked support).

Plaintiff states that:

> While the ALJ arguably discussed, albeit insufficiently, the "consistency" of the opinions of Dr. [Susan] Scholz-Rubin, Dr. [Evelia] Iglesias, and FNP [Ernesto] Guevara against the findings in their own and others' treatment records, **the ALJ made no effort to discuss the "supportability" of these opinions -- that is to say, the ALJ did not discuss these opinions in terms of reference to diagnostic techniques, data collection procedures/analysis, and other objective medical evidence**. 20 C.F.R. §§ 404.1527(c)(3), (4) and 416.927(c)(3), (4) (differentiating "supportability" and "consistency"); 20 C.F.R. §§ 404.1520c(c)(1), (2) and 416.920c(c)(1), (2) (further clarifying the difference between "supportability" and "consistency" for purposes of the post-March 27, 2017 regulations). Indeed, a reader with no previous knowledge of Farrat's claim would have **no information regarding how these medical sources reached any of the conclusions which the ALJ found to be "not persuasive," because the ALJ did not discuss any of the "medical evidence and supporting explanations" underlying their opinions as required, nor was any substantive rationale on the "supportability" of other opinions included comparing evidence from other medical sources and nonmedical sources in the claim against their opinions**. 20 C.F.R. §§ 404.1520c(c)(1) and 416.920c(c)(1). Accordingly, the ALJ had a duty to discuss the "supportability" factor in assessing every medical opinion on record, but the ALJ plainly failed to do so.

[ECF No. 15, p. 18 (emphasis added)].

Relying on cases applying the old regulations,[7] Plaintiff accuses the ALJ of

---

[7]     The cases cited by Plaintiff are *Castro v. Acting Comm'r of Soc. Sec.*, 783 F. App'x 948 (11th Cir. 2019), *Simon v. Comm'r, Soc. Sec. Admin.*, 7 F.4th 1094 (11th Cir. 2021), *Morales v. Apfel*, 225 F.3d 310 (3d Cir. 2000), *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1263 (11th Cir. 2019), and *Scott v. Astrue*, 647 F.3d 734 (7th Cir. 2011). [ECF No. 14, pp. 19–21].

In *Vergara v. Comm'r of Soc. Sec.*, a case involving the same attorney representing Plaintiff here, the Eleventh Circuit found the claimant's reliance on *Simon*, *Schink*, and *Castro* to be "misplaced" because:

> **Most important, each of these decisions involved applications for**

"fail[ing] to properly assess the opinion evidence of record" and instead "engage[ ] in little more than conjecture accompanied by cursory reference to benign clinical findings to completely disregard three treating professional expert psychiatric and psychological opinions." *Id.* at 22. She also argues that "just because there were some benign findings that were documented in a clinical setting, does not necessarily negate other clinically significant findings, nor do they speak to the limitations opined by Dr. Schlolz-Rubin, Dr. Iglesias, and FNP Guevara who were specifically asked to consider how the mental demands which commonly exist in a ***work setting*** would impact the claimant's capacity to ***function in the work environment***." *Id.* at 19 (emphasis in original).

She contends that "had the ALJ complied with the Regulations, the evidence would have overwhelmingly established that, at the very least, Farrat is far more limited than the ALJ finds, and that she is certainly incapable of performing any full-time, competitive capacity on a sustained basis." *Id.* at 23.

---

**disability benefits filed before 27 March 2017 and, thus, considered opinion evidence under the treating-physician old rule**: a rule inapplicable to [the plaintiff's] case. Further -- unlike in *Schink*, where the ALJ concluded that the claimant's bipolar disorder was no severe impairment based on evidence that the claimant's condition improved with treatment -- the ALJ here concluded that [the plaintiff]'s bipolar disorder constituted a severe impairment. *See Schink*, 935 F.3d at 1267–68.

No. 22-11671, 2023 WL 5814433, at *3 (11th Cir. Sept. 8, 2023) (emphasis added). Similarly here, the Undersigned does not find these cases persuasive or applicable to Farrat's case because it is governed by the *revised* regulations and the ALJ recognized Plaintiff's "depression[ ] [and] anxiety disorder/posttraumatic stress disorder" as severe impairments. (R. 18).

The Commissioner maintains that the ALJ properly assessed the opinion evidence under the applicable regulations. [ECF No. 20, pp. 9–13]. She notes that "the regulations do not require the ALJ to use 'magic language' or follow a particular formula to articulate consideration of the factors (*i.e.*, use variations of the terms supportability and consistency)." *Id.* at 10.

Because Farrat applied for disability insurance benefits on July 10, 2019 (R. 274–78), the revised regulations apply. *See Callahan v. Comm' r of Soc. Sec.*, No. 22-12701, 2023 WL 3736042, at *1 (11th Cir. May 31, 2023) ("For claims filed on or after March 27, 2017, the SSA's new regulations apply." (citing 20 C.F.R. § 404.1502c)). The revised regulations explicitly remove the "treating source rule," which required a certain level of deference to a claimant's treating physician. *Compare* 20 C.F.R. § 416.920c *with* C.F.R. § 416.927.

Under the revised regulations, the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 416.920c(a). Instead, in evaluating medical opinions and prior administrative medical findings, the SSA considers the following factors: **(1) supportability; (2) consistency**; (3) relationship with the claimant; (4) specialization; and (5) other relevant factors. 20 C.F.R. § 416.920c(c)(1)–(5) (emphasis added).

The SSA prioritizes (c)(1), supportability, and (c)(2), consistency, when assessing the persuasiveness of any given medical opinion. *See* 20 C.F.R. § 416.920c ("The most

important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability . . . and consistency[.]”). “[T]he ALJ must explain how he or she considered the factors of supportability and consistency, but the ALJ is generally not required to explain how he or she considered the other three factors.” *Elshater v. Kijakazi*, No. 22-CV-60466, 2022 WL 14890164, at *4 (S.D. Fla. Oct. 6, 2022), *report and recommendation adopted*, No. 22-60466-CIV, 2022 WL 14813795 (S.D. Fla. Oct. 26, 2022) (citing 20 C.F.R. § 404.1520c(b)(2)-(3)).

“Supportability refers to the relevance of ‘the objective medical evidence and supporting explanations presented by a medical source . . . to support his or her’ opinion.” *Decaso v. Kijakazi*, No. 21-20949-CV, 2022 WL 4110690, at *3 (S.D. Fla. Aug. 26, 2022), *report and recommendation adopted*, No. 1:21-CV-20949, 2022 WL 4110354 (S.D. Fla. Sept. 8, 2022) (citing 20 C.F.R. § 404.1520c(c)(1)). There is no requirement that the ALJ’s assessment of the opinion evidence be confined to one section of the decision. “The regulations do not prevent an ALJ from referring to evidence discussed elsewhere in the decision when evaluating medical opinions.” *Moore v. Kijakazi*, No. 8:23-CV-206-AAS, 2023 WL 8187216, at *6 (M.D. Fla. Nov. 27, 2023).

Moreover, “[u]se of these words [(supportability or consistency)] is not required . . . as long as the ALJ’s findings were ultimately based on these factors.” *Lewno v. Kijakazi*, No. 8:21-CV-1334-SPF, 2022 WL 3999282, at *5 (M.D. Fla. Sept. 1, 2022). “The articulation requirement is met so long as the evaluation addresses the substance of the factors,

regardless of the specific language used in the evaluation." *Moore v. Kijakazi*, No. 8:23-CV-206-AAS, 2023 WL 8187216, at \*4 (M.D. Fla. Nov. 27, 2023) ("While the ALJ did not use the word 'supportability,' elsewhere in the decision, the ALJ noted that, upon examination by Dr. Johnson, Ms. Moore had a normal range of motion in the lumbar spine and knees bilaterally, intact strength and sensation, a negative straight leg test and a normal Romberg.").

Here, the ALJ properly addressed the supportability prong when discussing Dr. Iglesias' opinion. However, and as discussed in more detail below, she failed to address the supportability prong for the opinions of Dr. Scholz-Rubin and Nurse Guevara. Accordingly, the ALJ's decision is due to be remanded.

### 1.    Dr. Evelia Iglesias

Dr. Iglesias conducted a psychiatric evaluation of Plaintiff and "[u]pon mental status examination, [she] was depressed, but appropriately dressed and groomed." (R. 22). Dr. Iglesias noted that Plaintiff "had intact immediate and recent memory and impaired attention and concentration," "had normal language, speech, and eye contact," and "had a good ability for abstraction and good insight and judgment." *Id.* She also noted that Plaintiff had agoraphobia. *Id.* She diagnosed Plaintiff with "posttraumatic stress disorder, generalized anxiety disorder, and major depressive disorder" and "prescribed Effexor, Enbrace HR, and Hydroxyzine." *Id.*

In subsequent treatment notes from August and October 2019, Dr. Iglesias

indicated that Plaintiff "had a better mood, but reported flashbacks and nightmares," "had good memory and fair ability to maintain attention and concentration," and "had good judgment and logical and [had] goal-directed thought form." *Id.* Treatment notes from January through September 2020 reflect that Plaintiff "had fair to poor attention and concentration and fair to poor memory" but had "a cooperative attitude and good judgment." *Id.* at 23.

Dr. Iglesias opined in an undated form that Plaintiff "had poor ability to . . . relate to coworkers; deal with the public; interact with supervisors; deal with work stress; and maintain attention/concentration." *Id.* She further opined that [Plaintiff] had a fair ability to follow work rules; use judgment; and function independently" and "a fair ability to understand, remembering [sic], and carry out simple job instructions, but had a poor ability to understand, remember, and carry out complex and detailed job instructions." *Id.* at 25.

The ALJ found Dr. Iglesias' opinion unpersuasive because:

it [was] inconsistent with the evidence of record as [a] whole. Specifically, **it [was] inconsistent with Dr. Iglesias's August and October of 2019 treatment notes documenting the claimant's good memory, fair ability to maintain attention and concentration, good judgment, and logical and goal-directed thought form** (Ex. 18F, pgs. 7 and 9). It also [was] inconsistent with the psychiatric treatment records from Dr. Dreyfuss ranging from December 2020 to June 2021 showing that the claimant had unremarkable memory, a cooperative attitude, and fair judgment (Ex. 15F, pgs. 15-20 and Ex. 16F).

*Id.* (emphasis added).

The Undersigned finds that the ALJ adequately addressed the supportability prong as required by the revised regulations. "The supportability factor deals with the extent to which a medical source has articulated support for the source's own opinion." *Lewno v. Kijakazi*, No. 8:21-CV-1334-SPF, 2022 WL 3999282, at *5 (M.D. Fla. Sept. 1, 2022). Here, the ALJ specifically cites Dr. Iglesias' **own** treatment notes as undermining her opinion concerning Plaintiff's abilities. *See Thomas v. Comm'r of Soc. Sec.*, No. 6:22-CV-852-KCD, 2023 WL 3090743, at *4 (M.D. Fla. Apr. 26, 2023) (supportability prong was met where the ALJ noted that the doctor's own records stated that "[the plaintiff]'s motor strength, sensation, reflexes, and gait were normal; he was able to tandem, toe, and heel walking; and his strength was normal in all extremities;" the plaintiff " reported his pain was managed with treatment;" and "[the doctor's] records documented no ongoing medication side effects after [the plaintiff's] medication was changed").

Moreover, to the extent supported by the record, the ALJ included mental limitations in Plaintiff's RFC, such as limiting Plaintiff to "interact[ing] occasionally with coworkers and supervisors, but . . . never . . . with the public." (R. 20). The fact that Plaintiff disagrees with the ALJ's assessment of Dr. Iglesias' opinion is not grounds for a remand. *See Moore v. Barnhart*, 405 F.3d 1208, 1213 (11th Cir. 2005) ("To the extent that [the plaintiff] points to other evidence which would undermine the ALJ's RFC determination, [the plaintiff's] contentions misinterpret the narrowly circumscribed nature of our appellate review, which precludes us from re-weighing the evidence or

substituting our judgment for that of the Commissioner even if the evidence preponderates against the decision." (cleaned up)).

### 2.    Dr. Susan Schlolz-Rubin

Unlike with Dr. Iglesias' opinion, the ALJ failed to properly assess the opinion of Dr. Schlolz-Rubin under the applicable regulations. The ALJ's decision notes that in March 2019, Plaintiff began treatment with Dr. Schlolz-Rubin, a psychologist, for anxiety and depression. (R. 22). "[Dr. Schlolz-Rubin] continued treating [Plaintiff] and helping her develop coping skills through December 2019. *Id.*

Plaintiff continued treatment with Dr. Schlolz-Rubin from January 2020 through September 2020. (R. 23). In February 2020, Plaintiff "reported that she was exercising, which included biking, roller blading, and going on a treadmill" and in October 2020, she "reported having more energy and a better mood, but still ha[d] issues with focusing" and "was alone a lot." *Id.*

In assessing Dr. Schlolz-Rubin's opinion, the ALJ stated:

On August 20, 2019, Dr. Schlolz-Rubin wrote that the claimant's **difficulties with work-related abilities were primarily due to her mental state that had been disrupted by anxiety and depression**. She noted that the claimant had difficulties with memory, concentration, motivation, and following through with a task. She also noted that **the claimant had little desire to engage in social interactions** outside of her family circle, and she wrote that **the claimant's fatigue hampered her ability to be productive with the demands of her job** (Ex. 10F, pg. 1 and Ex. 11F, pg. 2).

On March 29, 2020, Dr. Scholz-Rubin, opined that the claimant had **poor ability to do the following: follow work rules; deal with the public; interact with supervisors; deal with work stress; maintain**

**attention/concentration; understand, remember, and carry out detailed, but not complex job instructions; and relate predictably in social situations**. She opined that the claimant had a **fair ability to understand, remember, and carry out simple job instructions**, and she opined that the claimant had **no ability to do the same with complex job instructions**. She also opined that the claimant had a **fair ability to relate to coworkers, use judgment, and function independently** (Ex. 13F).

I find **the opinions of Dr. Scholz-Rubin not persuasive as they [are] inconsistent with the evidence of record as [a] whole**. Specifically, it is [sic] **inconsistent with Dr. Iglesias's August and October of 2019 treatment notes documenting the claimant's good memory, fair ability to maintain attention and concentration, good judgment, and logical and goal-directed thought form** (Ex. 18F, pgs. 7 and 9). They also are **inconsistent with the psychiatric treatment records from Dr. Dreyfuss ranging from December 2020 to June 2021 showing that the claimant had unremarkable memory, a cooperative attitude, and fair judgment** (Ex. 15F, pgs. 15–20 and Ex. 16F).

(R. 24–25 (emphasis added)).

The Commissioner contends that "[b]ecause the ALJ evaluated the basis of Dr. Scholz-Rubin's opinion against her limitations, the ALJ's decision clearly shows that the ALJ considered the supportability of this medical opinion." [ECF No. 20, p. 10]. The Undersigned disagrees.

While the ALJ discusses *why* Dr. Scholz-Rubin's opinion is inconsistent with the assessments of **other providers** (Dr. Iglesias and Dr. Dreyfuss), she fails to articulate *how* her analysis is related to the supportability factor, or otherwise *explain* her consideration of this factor. Here, the ALJ summarized Dr. Scholz-Rubin's records and opinion and then contrasted Dr. Scholz-Rubin's opinion with that of **other** medical professionals. While that may be sufficient to meet the consistency prong, it does *not* satisfy the

*supportability* prong.

"An ALJ must analyze whether a medical source's opinion is supported by the source's **own records**, and **simply noting a basis for a medical source's conclusion, without further analysis, is insufficient**." *Bell v. Comm'r of Soc. Sec.*, No. 6:22-CV-2174-DCI, 2023 WL 5275994, at *3 (M.D. Fla. Aug. 16, 2023) (emphasis added); *see also, Calsada v. Kijakazi*, No. 1:22-CV-00063-HBK, 2023 WL 6060042, at *8 (E.D. Cal. Sept. 18, 2023) ("Because the ALJ failed to explain how any of the specific limitations assessed by Dr. Krpan [were] unsupported by the **objective findings referenced in the opinion or his own treatment notes**, the ALJ's supportability finding is not supported by substantial evidence." (emphasis added)); *Bright v. Saul*, No. 1:19CV504, 2020 WL 4483008, at *3 (M.D.N.C. Aug. 4, 2020) ("Supportability is an **internal check** that references objective medical evidence and supporting explanations **that come from the source itself**." (emphasis added)).

### 3.    Nurse Ernesto Guevara

Lastly, concerning Nurse Guevara, the ALJ's decision stated as follows:

On July 16, 2021, Ernesto Guevara, FNP, opined that the claimant had a poor ability to do the following: follow work rules; deal with the public; deal with work stress; and maintain attention/concentration. He opined that the claimant had fair ability to interact with supervisors; relate to coworkers; use judgment; and function independently. In addition, Dr. [sic] Guevara opined that the claimant had a fair ability to understand, remember, and carry out simple job instructions and had a poor ability to do the same with detailed or complex job instructions (Ex. 17F).

**I find the opinion of Mr. Guevara not persuasive as it is inconsistent with**

36

the evidence of record as [a] whole. Specifically, **it is inconsistent with Dr. Iglesias's August and October of 2019 treatment notes** documenting the claimant's good memory, fair ability to maintain attention and concentration, good judgment, and logical and goal-directed thought form (Ex. 18F, pgs. 7 and 9). They also are **inconsistent with the psychiatric treatment records from Dr. Dreyfuss** ranging from December 2020 to June 2021 showing that the claimant had unremarkable memory, a cooperative attitude, and fair judgment (Ex. 15F, pgs. 15–20 and Ex. 16F).

(R. 25 (emphasis added)).

The Commissioner asserts that "[t]he ALJ . . . evaluated the supportability of Nurse Guevara's medical opinion with the reasons cited by Nurse Guevara ([R]. 25)" and then proceeds to cite Nurse Guevara's opinion (not the ALJ's decision), noting that "[the] nurse said that the clinical findings that supported his medical opinion included Plaintiff's diagnosis of major depressive disorder with anxiety, sadness, anxiety episodes such as panic attacks, isolation, poor concentration, poor attention span ([R]. 559)." [ECF No. 20, p. 11]. The Commissioner contrasts the underlying bases for Nurse Guevara's opinion with the ALJ's citation to "Plaintiff's good memory, fair ability to concentrate and maintain attention, cooperative attitude, and fair judgment." *Id.* at 11–12 (citing R. 25).

But the Commissioner cannot cure deficiencies in the ALJ's decision by supplying her own assessment of Nurse Guevara's opinion. This analysis -- contrasting Nurse Guevara's stated grounds for his opinion with the ALJ's recitation of "Plaintiff's good memory, fair ability to concentrate and maintain attention, cooperative attitude, and fair judgment" -- is not in the ALJ's decision. "[The Court] cannot affirm based on a *post hoc*

rationale that 'might have supported the ALJ's conclusion.'" *Watkins v. Comm'r of Soc. Sec.*, 457 F. App'x 868, 872 (11th Cir. 2012) (quoting *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir.1984)); *Vega v. Comm'r of Soc. Sec.*, No. 6:21-CV-1930-EJK, 2022 WL 17414259, at *2 (M.D. Fla. Dec. 5, 2022) ("While the Commissioner has examined the record and attempted to provide support for the ALJ's assessment of Dr. Perdomo's opinions, such post-hoc rationalizations do not provide the basis for judicial review of an administrative decision." (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983)).

The Commissioner further states that

> More importantly, the ALJ stated that her RFC was supported by evidence of Plaintiff's major depressive disorder, generalized anxiety disorder, and PTSD with symptoms of depressed and anxious moods and at times impaired memory and concentration for which she received regular and ongoing psychiatric treatment ([R]. 26). **The ALJ thus incorporated into her RFC the parts of these medical opinions that were supported and consistent with the record**. Though the ALJ's decision could have been clearer, the ALJ met the articulation requirement regardless of the specific language used in the evaluation.

[ECF No. 20, p. 12 (emphasis added)].

The revised regulations impose on the ALJ a duty to address the consistency and supportability prongs. 20 C.F.R. § 416.920c. Here, the Undersigned cannot conclude that the ALJ appropriately addressed (or even considered) the supportability prong in assessing Nurse Guevara's opinion. This alone warrants a remand. *See Farmer v. Comm'r of Soc. Sec.*, No. 6:23-CV-248-DCI, 2023 WL 9022722, at *4 (M.D. Fla. Dec. 29, 2023) ("An

ALJ must consider the supportability and consistency of the medical opinions of record, 20 CFR § 404.1520c(b)(2), and **the failure to do so is error**." (citing *Bailey v. Comm'r of Soc. Sec.*, 802 F. App'x 462, 465 (11th Cir. 2020) (emphasis added)).

In sum, the ALJ's assessments of the medical opinions of Dr. Schlolz-Rubin and Nurse Guevara do not comply with the revised regulations because she did not address the supportability prong.

**VI.     Conclusion**

The Undersigned **respectfully recommends** that the District Court **grant** Farrat's summary judgment motion, **deny** the Commissioner's summary judgment motion, and that the case be **remanded** pursuant to 42 U.S.C. § 405(g), with instructions to the ALJ to address the supportability prong in assessing the opinions of Dr. Schlolz-Rubin and Nurse Guevara.

**VII.     Objections**

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with the District Judge. Each party may file a response to the other party's objection within fourteen (14) days of the objection. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in the Report except upon grounds of plain error if necessary in the interests

of justice. *See* 29 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED** in Chambers, Miami, Florida, on January 22, 2024.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Robert N. Scola, Jr.
All counsel of record